ciation deductions, and thus to a gradual but continuous recovery of the postponed tax. Under plaintiff's view, there would be no such steady (though extended) payment of the tax.

In this light, the wording of the regulation does not seem to me to be decisive. Although we now consider the retirement-replacement-betterment system a general system of tax depreciation, that was not so clear in early 1953 when the regulation was promulgated. The broad language of Boston & Maine R. R. v. Commissioner, 206 F.2d 617 (C.A.1, 1953), was not yet on the books, and in the litigation of that case the Revenue Service obviously did not consider the retirement system a method of depreciation for all tax purposes. True, Chicago & North Western Ry. v. Commissioner, 114 F.2d 882, 885–886 (C.A.7, 1940), cert. denied, 312 U.S. 692, 61 S.Ct. 711, 85 L.Ed. 1128 (1941), had accepted, over the railroad's protest, the Service's designation of the retirement system as a proper method of computing depreciation deductions under the predecessor of § 167, but that did not necessarily mean that rails and tracks were "property of a character subject to the allowance for depreciation" (the terms of the regulation now involved). There could be different characterizations for different purposes. The Service may have been thoughtless in letting this language remain unqualified after the *Boston & Maine* opinion, but that neglect does not override, in my opinion, the indications that neither the Congress nor the Treasury expected the regulation to be applied as plaintiff would have it.

Nor does it not seem to me stretching the words too far to exclude (because the purpose so requires) the plaintiff's replacement system for rails and track. The literal language is not that compelling or rigid. It is possible, in this setting, to read a "reduction in basis" to be applied "first against property of a character subject to the allowance for depreciation under section 167" as limited to property the basis of which is significant in the computation of the depre-

ciation deduction and, conversely, as designating replaced property as not "of a character subject to the allowance for depreciation."

In sum, I deem fulfillment of the legislative goal in this particular context as more important than adherence to the normal understanding, in other contexts, of the general language of the regulation, and believe that there is an acceptable reading of the regulation which advances rather than negates the Congressional aim.

NICHOLS, Judge, joins in the foregoing dissenting opinion.

**FIRST NATIONAL BANK IN DALLAS,**
Trustee of the Sun Investment Company Liquidating Trust

v.

**The UNITED STATES.**

No. 346–69.

United States Court of Claims.
Dec. 12, 1972.

**532**

Robert S. Price, Philadelphia, Pa., for plaintiff. Robert L. Bast, Philadelphia, Pa., attorney of record.

Robert N. Dorosin and Joseph Kovner, Washington, D. C., with whom was Asst. Atty. Gen., Scott P. Crampton, for defendant.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges.

## OPINION

### PER CURIAM:

This case was referred to Trial Commissioner Mastin G. White with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 134(h). The commissioner has done so in an opinion and report filed on November 2, 1971. Exceptions were filed by plaintiff to the commissioner's opinion, findings of fact and recommended conclusion of law, defendant took no exceptions thereto and the case has been submitted to the court on the briefs of the parties and oral argument of counsel. Since the court agrees with the trial commissioner's opinion, findings of fact and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Therefore, it is concluded that plaintiff is entitled to recover to the extent indicated in the commissioner's opinion, together with interest thereon as provided by law, and judgment is entered for plaintiff accordingly with the amount of recovery to be determined pursuant to Rule 131(c).

### OPINION OF COMMISSIONER

WHITE, Commissioner:

The plaintiff sues in this case for a refund of the additional interest equalization tax (and interest thereon) which the Sun Investment Company ("Sun") paid for the final quarter of 1965 pursuant to a tax deficiency that was assessed against Sun by the Internal Revenue Service.

The defendant concedes that the plaintiff is entitled to recover, although not to the full extent sought by the plaintiff.

The present suit arose out of a transaction that occurred on December 29, 1965, between Sun and L. J. Hooker Investment Corporation, Ltd. ("Hooker"). At the time, Sun was a Delaware corpo-

ration that maintained its principal office in Dallas, Texas, and Hooker was a New South Wales, Australia, corporation that maintained its principal office in Sydney, Australia. Hooker was engaged (through many subsidiaries) in real estate development and operation, and also in large-scale farming that involved about 10,000 square miles of land.

On December 29, 1965, Hooker obtained $4,002,242.50 in cash from Sun, and Hooker furnished to Sun—either directly or through Sun's nominee, Murchison Brothers—21 promissory notes with a stated interest rate of 6½ percent each and a total face amount of $4,002,242.50.

Ten of the Hooker promissory notes were issued as Series A notes in the face amount of $350,000 each, or an aggregate of $3,500,000, and 10 were issued as Series B notes in the face amount of $50,000 each, or an aggregate of $500,000. These 20 promissory notes, having a total face amount of $4,000,-000, were due at serial maturities during the period from September 1967 through June 1977, although the entire principal of any of the 20 notes could be prepaid by Hooker at any time upon the payment of a premium.

As security for the 10 Series A promissory notes, having a total face amount of $3,500,000, Hooker issued 10 debenture stock certificates, which constituted a pledge of the stock of companies controlled by Hooker and provided additional protection for the holder of the Series A notes upon default. The Series B notes were unsecured.

In addition to the 10 Series A notes and the 10 Series B notes previously mentioned, Hooker also issued to Sun (through Sun's nominee, Murchison Brothers) an instrument which was in the form of a promissory note for 1,000 Australian pounds (or $2,242.50 in United States money), bearing stated interest at the rate of 6½ percent and repayable in 11 years. This instrument, in a provision that is very significant from the standpoint of the present litigation, granted to the holder an option to purchase, "by way of redemption of this Note" and at any time during the 11-year term of the note, 2,000,000 shares of Hooker ordinary stock units at a price of 5 shillings (or $0.560625 in United States money) per share. Thus, the total purchase price for the 2,000,000 shares would be 500,000 pounds, or $1,121,250. However, the holder of the note could either exercise the option wholly, utilizing the entire face amount of the note as a payment of 1,000 pounds (or $2,242.50) on the total purchase price of 500,000 pounds (or $1,121,250) for the stock, or could exercise the option partially for not less than 1,000 stock units (or multiples thereof) and the note would be reduced proportionately. In the event of an exercise of the option, the balance of the purchase price for the stock, over and above the portion paid for through the use of the note for this purpose, was to be paid within 1 month after the issuance of the stock.

The option which Sun acquired in the transaction previously mentioned was never exercised by Sun, either wholly or partially.

In its interest equalization tax return for the last quarter of 1965, Sun reported its acquisition of the 21 Hooker promissory notes at their face amounts, aggregating $4,002,242.50, and as debt obligations. Sun paid a total interest equalization tax of $197,786.13 on the acquisition of the 21 notes.

The Internal Revenue Code of 1954, as amended, imposes the interest equalization tax "on each acquisition by a United States person * * * of stock of a foreign issuer, or of a debt obligation of a foreign obligor * * *" (26 U.S.C. § 4911(a)). The tax on the acquisition of a debt obligation (which is defined in 26 U.S.C. § 4920(a)(1) as meaning "any indebtedness * * *") is based upon the actual value of such obligation and a rate which varies in relation to the period of time remaining to maturity (26 U.S.C. § 4911(b)(1)(B)). In the present case, the rates used by Sun in computing the amount of the tax on the

acquisition of the 21 promissory notes as debt obligations ranged from a low of 1.5 percent to a high of 8.3 percent.

Upon auditing Sun's account, the Internal Revenue Service determined a tax deficiency in the amount of $29,174 against Sun, on the ground that Sun, in addition to paying the interest equalization tax on the 21 Hooker promissory notes as debt obligations, should also have paid the interest equalization tax on the stock option, which was valued by the Internal Revenue Service at $290,000 for such purpose. In this connection, the interest equalization tax on the acquisition of stock issued by a foreign corporation is imposed at the flat rate of 15 percent on the actual value of the stock (26 U.S.C. § 4911(b)(1)(A)); and the term "stock" is defined as including, inter alia, "any * * * option or similar right to acquire, any stock * * *" (26 U.S.C. § 4920 (a)(2)(E)). Sun paid the tax deficiency of $29,174, plus interest in the amount of $2,609.27, on August 7, 1967, thus providing the basis for the present suit for a refund.

Sun was liquidated on September 15, 1967. This action for a refund was instituted, and is being maintained, by the First National Bank in Dallas as the trustee of the Sun liquidating trust.

The plaintiff, in contending that the convertible note of December 29, 1965, was subject to the interest equalization tax only as a debt obligation, relies principally upon the circumstance that one of the definitions of "stock" contained in 26 U.S.C. § 4920(a)(2) is "(D) any indebtedness which is convertible by its terms into stock of the obligor, if it is so convertible only within a period of 5 years or less from the date on which interest begins to accrue thereon * * *." Consistently with this particular definition of "stock," 26 U.S.C. § 4920(a)(1)(B) declares that the term "debt obligation" shall not include "any obligation which—(i) is convertible by its terms into stock of the obligor, if it is so convertible only within a period of 5 years or less from the date on which

interest begins to accrue thereon * * *." The plaintiff concludes from these statutory provisions that any debt obligation which may be converted into stock of the obligor during a period in excess of 5 years—such as the 1,000-pound note of December 29, 1965, which could be converted into Hooker stock within a period of 11 years—must be excluded from the "stock" category and included within the "debt obligation" category.

The plaintiff's line of reasoning would be persuasive if the instrument with which we are concerned had merely provided for the conversion of the indebtedness which it evidenced into Hooker stock units. However, it is significant that the 1,000-pound indebtedness evidenced by the instrument of December 29, 1965, was convertible into a maximum of 4,000 shares of Hooker stock units, whereas the instrument in question granted an option for the acquisition of a total of 2,000,000 such shares for an aggregate purchase price of 500,000 pounds, or 500 times the number of shares that could be obtained through the conversion of the 1,000-pound indebtedness. Thus, it would not be realistic to adopt the plaintiff's view and treat the option provision in the 1,000-pound note as if it related merely to the conversion of the indebtedness evidenced by the note within a permissible period greater than the 5 years referred to in 26 U.S.C. § 4920(a)(2)(D) and (a)(1)(B)(i). We are dealing here with a provision which was, in reality, an option to acquire 2,000,000 shares of Hooker stock units for a total purchase price of 500,000 pounds and, therefore, fell within the definition of "stock" contained in 26 U.S.C. § 4920(a)(2)(E)— "any interest in, or option or similar right to acquire, any stock * * *." The acquisition of the option was subject to the interest equalization tax at the rate of 15 percent, applied to the actual value of the option right.

Since the face amount of the promissory note which contained the option provision (i. e., 1,000 Australian pounds,

or $2,242.50) was only 1/500th of the total purchase price of the 2,000,000 shares of stock which could be purchased under the option provision (*i. e.*, 500,000 pounds, or $1,121,250), it would be unreasonable to presume that the right to buy the 2,000,000 shares of Hooker stock was granted to Sun in return for its purchase of the 1,000-pound note. It is much more reasonable to infer that the option was granted to Sun on the basis of Sun's purchase of the entire group of 21 promissory notes having a total face amount of $4,002,242.50. The option right in the 1,000-pound note appears, in substance, to have been a detachable warrant with respect to Sun's package investment in Hooker. The circumstance that the option provision was placed in an instrument which also included a debt obligation of 1,000 Australian pounds does not change the essential nature of the transaction. In this connection, it seems fair to conclude that Sun, by this arrangement, was attempting to control the tax consequences of the acquisition of an option right worth many times the value of the 1,000-pound debt obligation with which the option right was included.

With respect to the value of the option right, the evidence in the record shows that, as debt obligations, the 21 promissory notes which Sun acquired from Hooker had an actual value substantially less than their face amounts. On December 29, 1965—which was the same day on which Sun acquired the 21 promissory notes—Sun sold the 10 Series A notes, together with their collateral security in the form of 10 debenture stock certificates, to Keystone Custodian Funds, Inc. ("Keystone"), a Delaware corporation which maintained its principal office in Boston, Massachusetts. The Series A notes had a total face amount of $3,500,000, and they were sold, together with their collateral security, to Keystone for $3,246,270, or 92.75 percent of their face amount. Keystone was an independent third party, and the purchase by Keystone of the Series A notes from Sun was an arm's-

length transaction that established the actual value of the Series A notes. Sun recorded this transaction on its books by capitalizing the difference of $253,750 between the total face amount of the Series A notes and the amount for which they were sold as the cost of an option to acquire 1,750,000 shares of the ordinary stock units of Hooker. To Sun, therefore, the acquisition of the option to purchase 2,000,000 shares of Hooker stock had a proportionate relationship to the acquisition of the Series A notes, and the value of the stock option was separable from the value of the debt obligations.

If the Series A notes, with their collateral security, had an actual value which was only 92.75 percent of their face amount, it is reasonable to infer that the actual value of the 10 Series B notes, which were unsecured, was not more than 92.75 percent of their face amount of $500,000, or $463,750. It is also reasonable to infer that the actual value of the 1,000-pound note, solely as a debt obligation, was not more than 92.75 percent of its face amount of $2,242.50, or $2,079.92.

Accordingly, it appears that, as debt obligations, the 21 promissory notes which Sun acquired from Hooker had an actual value which was only 92.75 percent of their total face amount of $4,002,242.50, or $3,712,079.92, and that the remainder of the $290,162.58 in cash which Sun furnished to Hooker represented the value of the stock option right which Sun acquired as part of the investment package.

That the option right which was included in the 1,000-pound note had a value that was separable from—and vastly greater than—the face amount ($2,242.-50) of the debt obligation contained in the same instrument is also shown by the circumstance that on September 15, 1967 (the date of Sun's liquidation), Sun assigned to Murchison Brothers the 1,000-pound note, including the option right, for a total purchase price of $292,242.50.

As indicated previously, a finding is warranted that the option right in the 1,000-pound note had an actual value of $290,162.58. The defendant concedes that, even with this slight increase over the valuation figure of $290,000 used by the Internal Revenue Service, there was an overassessment of tax deficiency against Sun, and that the correct amount of the deficiency should have been $26,337.47 instead of $29,174. The plaintiff is entitled to recover in the present action on the basis of the over-assessment, amounting to $2,836.53, together with statutory interest.

**SPACE CORPORATION**

v.

**The UNITED STATES.**

No. 328–70.

United States Court of Claims.

Dec. 12, 1972.

